Stratham School v. Beth & David P.    CV-02-135-JD  02/05/03
                    UNITED STATES DISTRICT COURT FOR THE
                          DISTRICT OF NEW HAMPSHIRE


Stratham School District

     v.                                Civil No. 02-135-JD
                                       Opinion No. 2003 DNH 022
Beth and David P.


                              O R D E R


     Stratham School District brings an action under the

Individuals with Disabilities Education Act ("IDEA"), 20 U.S.C. §

1415(i)(2), challenging the decision of the New Hampshire

Department of Education issued on February 19, 2002.[1]  In that

decision, the Department concluded that Stratham School District

("District") is responsible under the IDEA for costs incurred for

cochlear implant "mapping" and ordered the District to reimburse

the parents for travel to and from the audiologist and to pay for

"mapping" services provided by the audiologist.[2]  The District

appeals the decision, arguing that cochlear implant mapping is

not a "related service" within the meaning of the IDEA.

_____

     [1]The hearing officer's decision is the decision of the New
Hampshire Department of Education.  See N.H. Rev. Stat. Ann. §
186-C:16-a & 16-b.

     [2]Cochlear implant mapping refers to the programming
necessary to make the system work.

Background[3]

This case involves services for Hunter P., and was brought on his behalf by his parents, Beth and David. Hunter was born on July 30, 1996, and lives with his family in Stratham, New Hampshire. Hunter has had a profound hearing loss in both ears since birth and is, therefore, deaf. His parents and two brothers have normal hearing and communicate through oral speech.

In September of 1997, Hunter was fitted with acoustical hearing aids. Although the District apparently disputes this, the hearing officer found that during the year Hunter used the hearing aids it became apparent that he was not obtaining any benefit from them due to his profound hearing loss. His parents then decided that they wanted Hunter to use an auditory and oral system for communication.

As a result of examinations, Hunter was found to be an appropriate candidate for a cochlear implant. With advice from Dr. Glen Johnson, Hunter's parents chose a Clarion cochlear

---

[3]Counsel were unable to comply with Local Rule 9.3(d) due to their personal dislike for each other. See Report and Recommendation at 4, Dec. 20, 2002. Although the magistrate judge concluded that sanctions were not appropriate, he detailed the history of the difficulties that counsel had with each other. When personality conflicts are allowed to interfere with the progress of a case, there is a disservice done to the litigants and the court. As a result, the court is left to construct background facts from the "redlined" factual submissions submitted by counsel for each side.

implant device manufactured by Advanced Bionics Corporation.  Dr. Johnson performed the surgery on March 3, 1999, to implant the internal components of the device:  a receiver-stimulator in Hunter's skull under his scalp and an electrode array in the cochlea of his right ear.

Six weeks after the surgery, Hunter met with Suzanne Lenz, a clinical audiologist at Dartmouth-Hitchcock Clinic in Lebanon, New Hampshire.  Lenz fitted Hunter with the external components of the device, which are a headpiece with a microphone and radio frequency transmitter, placed behind his right ear, a speech processor, and a cable connecting the headpiece to the speech processor.  The speech processor is carried in a pouch fastened to Hunter's clothing.  Once the external components were fitted, Lenz activated and programmed the speech processor.

Although the District apparently disputes the number of appointments, the hearing officer found that Hunter has had seventeen subsequent appointments with Lenz and two appointments with audiologist Linda Strojny.  Lenz and Strojny are audiologists, not physicians, who have experience with cochlear implants.

As noted above, programming the speech processor is called "mapping."  Proper mapping is essential to the use of a cochlear implant.  Particularly in the case of a child, mapping must be

done accurately to permit adequate language development. Improper mapping or improperly functioning equipment will have a negative effect on an implanted child's education. Only a specially trained audiologist can perform mapping. A speech language pathologist works closely with the audiologist for mapping, but a pathologist cannot map the device.

To begin the mapping process, a specially trained audiologist chooses a coding strategy, which is a plan for the electrical stimulation of the electrodes implanted in the cochlea. The audiologist then connects the speech processor to a computer and uses the coding strategy to create a map for the pattern and intensity of the electrical current to the electrodes in order to create sound sensations. The goal is to determine the amount of electrical current that will provide a comfortable level of sound sensation. The speech processor may have three maps to accommodate different listening environments. The audiologist determines the mapping needs of each user based in part on information provided by the user's family and school staff. The speech processor has controls for volume and microphone sensitivity.

In May of 1999, the District identified Hunter as being eligible for special education services, under Part B of the IDEA, because of his deafness. Hunter attended a three-week

4

summer program in Manchester, New Hampshire, called HEAR in New Hampshire ("HNH"), which is directed by Michael Moon. The District then placed Hunter at HNH, now located in Hooksett, New Hampshire, for the school years from 1999 through 2001. When Hunter began the program at HNH he had no spoken language and responded in very limited ways to oral and auditory communications.

At present, Hunter attends HNH in the morning, and four afternoons each week he attends a special education preschool program at Stratham Memorial School. Hunter's Individualized Education Program ("IEP") provides for five hours per week of speech therapy and three hours per week of service from a teacher of the acoustically handicapped at HNH. Hunter's IEP includes objectives based on his use of the cochlear implant and assumes that he will learn to hear. If his mode of communication changed, his IEP would also change.

The HNH staff check the cochlear implant equipment each day to be sure that it is functioning by asking the child to indicate whether he can detect ten different sounds. If the equipment appears to be functioning but Hunter's responses are not what the staff would expect, they refer him to the audiologist, Suzanne Lenz, to perform further checks. Although the HNH staff can choose among the three maps provided on Hunter's speech

processor, the HNH staff is not qualified to perform mapping.

Beginning in April of 2000, Beth P. began seeking reimbursement from the District for mileage used to drive Hunter to audiology appointments for mapping the speech processor. The District decided that the trips for mapping were not covered by the IDEA and, therefore, that the District was not obligated to reimburse for mileage. In February of 2001, Beth P. requested reimbursement for the insurance co-payments of $10 she was charged for each mapping appointment beginning on November 15, 1999. The District refused to reimburse Hunter's parents for the co-payments.

Beth P. and David P. initiated a due process hearing on their requests for mileage and reimbursement for co-payments. The hearing was held before Hearing Officer John LeBrun, appointed by the New Hampshire Department of Education, on November 1 and 2 and December 7 and 11, 2001. Hunter's parents presented testimony from Donald K. Eddington, Director of the Cochlea Implant Research Laboratory at the Massachusetts Eye and Ear Infirmary; Michael Moon, Director of HNH; Beth P., Hunter's mother; Ronnie Sue Duby, a parent of another child at HNH, and Linda Strojny, audiologist, who is employed by Advanced Bionics Corporation, the maker of Hunter's implant device. The District presented testimony from Marilyn Neault, Director of Audiology

6

Services at Boston Children's Hospital; Ann Bednar, a deaf education consultant; Dorothy Eisenhaure, a speech language pathologist; Patricia Willis, Director of Special Education for the supervisory administrative unit that includes the District; and Margaret Driscoll, Co-Director of Special Services for the District.

Following the hearing, Hearing Officer LeBrun issued a decision in which he presented the issues as follows:

> First, the parents take the position that the audiologist should be identified in Hunter's IEP as a Related Service. The District believes it is not necessary to include the audiologist as a Related Service. Secondly, the parents request reimbursement for their transportation expenses for visits to the audiologist from their home in Stratham to and from the office in Lebanon, New Hampshire. Finally, the parents believe they should be reimbursed for the portion of the audiologist expenses that are not covered by insurance (i.e. the co-pays).

Decision at 2. The hearing officer further explained that the District believed that the IDEA does not cover cochlear implant services because a cochlear implant is not an acoustical hearing aid and is not included specifically in the IDEA or its regulations and because cochlear implant mapping is a medical service not covered by the IDEA. The hearing officer concluded that the mapping services are a necessary related service under the IDEA and that the audiology services provided by Suzanne Lenz were related services for Hunter's IEP. The District was ordered

7

to reimburse Hunter's parents for mileage for the trips to Lenz's office and for insurance co-payments for the mapping services.

## Discussion

The standard of review in an IDEA case depends on whether the issue on appeal presents a question of fact or law.  A hearing officer's factual findings are reviewed under an intermediate standard which "'requires a more critical appraisal of the agency determination than clear-error review entails, but which, nevertheless, falls well short of complete de novo review.'"  Rafferty v. Cranston Pub. Sch. Comm., 315 F.3d 21, 25 (1st Cir. 2002) (quoting Lenn v. Portland Sch. Comm., 998 F.2d 1083, 1086 (1st Cir. 1993)).  In contrast, a purely legal question is reviewed de novo.  See Manchester Sch. Dist. v. Crisman, 306 F.3d 1, 9 (1st Cir. 2002).  The burden of proof rests with the party challenging the agency decision, which is the District in this case.  See Hampton Sch. Dist. v. Dobrowolski, 976 F.2d 48, 54 (1st Cir. 1992).

The IDEA "was enacted, in part, 'to assure that all children with disabilities have available to them . . . a free appropriate public education which emphasizes special education and related services designed to meet their unique needs.'"  Cedar Rapids Cmty. Sch. Dist. v. Garret F., 526 U.S. 66, 68 (1999) (quoting 20

8

U.S.C. § 1400(d)(1)(A) (formerly § 1400(c))). Participating states, such as New Hampshire, receive federal financial assistance for IDEA mandated services. See id.; see also Murphy v. Timberlane Reg'l Sch. Dist., 22 F.3d 1186, 1188 at n.2 (1st Cir. 1994). States that receive federal aid under the IDEA are obligated to provide special education and related services as defined by the Act. See Rome Sch. Comm. v. Mrs. B., 247 F.3d 29, 32 (1st Cir. 2001); see also Irving Indep. Sch. Dist. v. Tatro, 468 U.S. 883, 891 n.8 (1984) (construing predecessor to IDEA, Education of the Handicapped Act). A qualified child's unique needs are addressed by an IEP. See 20 U.S.C. § 1414(d); see also Bd. of Educ. v. Rowley, 458 U.S. 176, 181-82 (1982).

Although the District contends that the hearing officer's decision is wrong under both the IDEA and state law, the District focuses primarily on the IDEA and does not argue that New Hampshire would provide a different standard. Therefore, the court will not separately address the issue under New Hampshire law. In the complaint, the District frames the issues to be decided in terms of four errors by the hearing officer.[4] In its

_____

[4]First, the District contends that the hearing officer erred in granting the parents' proposed ruling of law that the child's IEP team is obligated to respect the parents' decision as to the child's mode of communication and ensure that the IEP is consistent with that mode of communication, citing 20 U.S.C. § 1414(d)(3)(B)(iv) and 34 C.F.R. § 300.346(a)(2)(iv). Second, the

decision memorandum, the District consolidates its claims into a single issue to be decided on appeal:  whether the New Hampshire Department of Education erred as a matter of law in determining, through the hearing officer's decision, that "mapping" for a cochlear implant constitutes "related services" under the IDEA, which obligates the District to pay for travel and insurance co-payments for audiologist appointments.

The term "related services" is defined in the IDEA to mean "transportation, and such developmental, corrective, and other supportive services (including speech-language pathology and audiology services, . . .) as may be required to assist a child with a disability to benefit from special education , . . . ." § 1401(22).  In the context of related services, "[a]udiology includes," in relevant part, "[p]rovision of habilitative activities, such as language habilitation, auditory training, speech reading (lip-reading), hearing evaluation, and speech

District contends that the hearing officer erred by concluding that cochlear implant mapping is a related service under the IDEA, citing § 1401(22).  Third, the District defines the cochlear implant as a "sensory organ" and contends that the hearing officer erred in finding the District obligated to program a child's sensory organ "irrespective of the sociological, privacy, family and liability concerns attendant thereto."  Fourth, the District contends that the hearing officer erred in concluding that because Hunter's IEP was designed around the cochlear implant, the District was obligated to ensure that the implant worked outside of the school setting.

conservation." 34 C.F.R. § 300.24(b)(1)(iii). The word "includes," as used in the regulations interpreting the IDEA, means that "the items named are not all of the possible items that are covered, whether like or unlike the ones named."[5] 34 C.F.R. § 300.14.

Although mapping for cochlear implants is not included within the enumerated audiology services provided in the statute and regulations, § 300.14 broadens the scope of the definition of audiology beyond the enumerated examples. As described in this case, the mapping process is the system that allows the cochlear implant to provide usable sound sensation to Hunter. The mapping process is performed by trained audiologists. Absent a clear indication that such audiology services were not intended to be included within "related services," the definition would appear to encompass the mapping process.[6]

The only reported decision to have considered similar

----

[5]The regulations address the responsibility of schools to ensure that children's hearing aids are functioning properly, see 34 C.F.R. § 300.303, but cochlear implants are not mentioned in the regulations. The parties agree that a cochlear implant is not an acoustical hearing aid.

[6]The District's argument that Congress could have included mapping as a covered audiology service, along with the specific provision for acoustical hearing aids, and therefore its absence shows Congressional intent not to include mapping, is not persuasive.

11

circumstances is <u>Bd. of Educ. of Paxton-Buckley-Loda v. Jeff S.</u>, 184 F. Supp. 2d 790, 804 (C.D. Ill. 2002). In that case, the child, who had a cochlear implant, was receiving auditory verbal therapy ("AVT") which included mapping his implant system. <u>Id.</u> at 792-93. The child's parents challenged the District's failure to comply with IDEA procedures, the District's placement of the child, the District's failure to provide supportive services for the child's implant, and failure to pay for the child's private school placement. <u>Id.</u> at 797-804. The district court affirmed the hearing officer's decision ordering the District to provide AVT to the child and to pay the costs of the AVT services. <u>Id.</u> at 801-03 & 804.

The court did not address the question of whether AVT and mapping services for a cochlear implant were "related services" within the meaning of the IDEA. Instead, the issue addressed in <u>Jeff S.</u> was whether the AVT system provided the child a free appropriate public education, as required by the IDEA, and whether the evidence supported the hearing officer's decision. The court concluded that the District must provide and pay the costs of the child's AVT services, as determined by the child's therapists, but that after an appropriate IEP was developed, the District would also have recourse to a due process hearing if it disagreed with the services recommended. <u>Id.</u> at 804. As such,

12

it appears that the parties never disputed that such services would be included within "related services" under the IDEA.

In contrast, here the IEP developed for Hunter is designed to use his cochlear implant as his method of communication, and his parents and the District do not contest the adequacy of the IEP. The District contends, however, that mapping is not a related service under the IDEA because other communication methods are possible, and might be determined to be more appropriate for Hunter. In that case, the District contends, Hunter's IEP team would design a program to address his needs with a different mode of communication.

The IDEA requires a school district to provide "such services as are necessary to permit the child to benefit from the instruction." Rowley, 458 U.S. at 189. Stated in other terms, a school district is required to provide supportive services that permit a disabled child to have meaningful access to education. See Garret F., 526 U.S. at 73. The educational method to be used in each case is left "to state and local educational agencies in cooperation with the parents or guardians of the child." Rowley, 458 U.S. at 207. The IEP provides the mechanism for determining the appropriate educational method and goals to achieve a free appropriate public education and requires that the parents be included in the process along with teachers and a representative

13

of a local educational agency with special knowledge about the needs of children with disabilities. § 1414(d); see also Shapiro v. Paradise Valley Unified Sch. Dist. No. 69, 2003 WL 187205 (9th Cir. Jan. 29, 2003) (discussing IEP process for child with cochlear implant).

There is no dispute that, at present, Hunter's mode of communication involves the use of his cochlear implant and that the cochlear implant must be mapped for him to benefit from the instruction provided by the District. Hunter's IEP is based on his current mode of communication through his cochlear implant. The IEP, therefore, confirms that the educational methodology chosen for Hunter includes the use of the cochlear implant as a necessary part of the free appropriate public education provided to him. Under these circumstances, the mapping services necessary for the use of Hunter's cochlear implant are "related services" within the meaning of the IDEA.

Conclusion

For the foregoing reasons, the decision of the New Hampshire Department of Education is affirmed.[7] The plaintiff's motion for

_____

[7]Because the issue presented on appeal is a legal question, subject to de novo review, the court does not address the individual findings and rulings issued by the hearing officer.

14

oral argument (doc. no. 28) is denied.  The clerk of court will enter judgment accordingly and close the case.

    SO ORDERED.


                                  _____
                                  Joseph A. DiClerico, Jr.
                                  United States District Judge

February 5, 2003

cc:   Jeanne M. Kincaid, Esquire
      Peter S. Smith, Esquire
      Arthur H. Ackerhalt, Esquire